# Exhibit 1

NewsRoom

9/25/20 FD (Fair Disclosure) Wire 21:30:00

FD (Fair Disclosure) Wire
Copyright (c) 2020 Thomson Financial and ASC LLC

September 25, 2020

# Aquestive Therapeutics Inc Conference Call - Final

Presentation

OPERATOR: Ladies and gentlemen, thank you for your standing by, and welcome to Aquestive Therapeutics conference call. (Operator Instructions)

I would now like to turn the conference over to your first presenter, Ms. Stephanie Carrington, Westwicke Investor Relations. Please go ahead, ma'am.

STEPHANIE CARRINGTON, SVP, ICR, LLC: Thank you, operator. Good evening and welcome to today's conference call. On today's call, I am joined by Keith Kendall, Chief Executive Officer; Dan Barber, Chief Operating Officer; and John Maxwell, Chief Financial Officer, who are going to provide an overview of the recent business development. In addition, additional members of the Aquestive team will be available for Q&A. In total, we expect today's call to last approximately 60 minutes.

As a reminder, the company's remarks today correspond with the press release that we issued after market close today in a Form 8-K that was filed with the Securities and Exchange Commission, containing prepared responses to anticipated questions during this call and relevant charts to the business developments we will be discussing tonight. In addition, a recording of today's call will be made available on Aquestive Therapeutics' website within the Investor Relations section shortly following the conclusion of this call.

Before we begin, let me remind you that today's call will include forward-looking statements based on the company's current expectations. Such statements represent our judgment as of today only and are subject to risks and uncertainties that could cause actual results to differ materially from those described in these statements. We undertake no obligation to revise or update these forward-looking statements in light of new information or future events, except as required by law. For information concerning risk factors that could affect the company, please refer to the Risk Factors section in the company's annual report on Form 10-K filed with the SEC on March 11, 2020, and in its quarterly reports on Form 10-Q.

With that, I'll now turn the line over to Ken -- line to Keith.

KEITH J. KENDALL, CEO, PRESIDENT & DIRECTOR, AQUESTIVE THERAPEUTICS, INC.: Thank you, Stephanie, and thank you, everyone, for reacting quickly and your flexibility in joining us this evening. Disappointingly, today, we received a complete response letter from the FDA on our new drug application for our product candidate, Libervant or diazepam buccal film for the management of seizure clusters.

As we outlined in our press release, the FDA issues a CRL to indicate that the review cycle for an application is complete, but the application cannot be approved in its current form. In the CRL, the FDA limited its comments to only 1 of the 9 studies performed by Aquestive and included in our Libervant NDA. Importantly, other than procedural observations concerning a small number of blood draws, the FDA did not identify deficiencies on any other issues beyond their comments on this one particular study.

The study commented on by the FDA was Study 180323, which was a crossover study comparing the pharmacokinetic or PK profiles of Libervant and Diastat, the referenced listed drug to Libervant, in subjects diagnosed with epilepsy and actively taking antiepileptic drugs or AEDs. As far as we are aware, this is the first pharmacokinetic study ever performed using Diastat in subjects with epilepsy.

Study 180323 contained 28 subjects and, from Aquestive's perspective, had solid results. As many of you know, PK studies generally focus on 3 measures: total exposure, referred to as area under the curve or AUC; the highest concentration of a drug at a known time point or Cmax; and the time to reach the highest concentration of drug or Tmax. In Study 180323, Libervant exceeded the AUC measure when compared to Diastat, was within normal comparability ranges for Cmax and had a Tmax within the published Diastat label. We were quite pleased with these results.

However, the FDA noted in its CRL that in Study 180323, there were 2 weight groups where the Cmax ratio comparing Libervant to Diastat were not as close to comparability as the FDA would like to see. In addition, the FDA noted that there were 5 subjects out of 28 who, when grouped together, had a Cmax ratio closer to 50% of Diastat. Importantly, 4 of these 5 individuals were within the same weight groups I mentioned before. The FDA had no further comments on the study or in any of the other weight groups.

We had extensive and collaborative discussions with the agency about this question right up until and through Monday of this week. From Aquestive's standpoint, this CRL is heartbreaking. We have put a robust package together that thoroughly characterizes Libervant as well as Diastat. We have over 1,300 dosings in our safety study with promising results. This is an important product for patients, and we're very disappointed that our application was not approved for immediate distribution. In the short term, we believe this is a detriment to the epilepsy community, especially patients and caregivers.

However, in our discussions with the FDA to date, we believe there is a logical path forward that will not require additional clinical studies. Using the robustness of the data from our 9 studies, we believe we can utilize modeling to adjust the dosing regimen for the weight groups noted in the FDA CRL. In all of our studies, Libervant has proven to have excellent linearity, which is a basis for predictability when modeling dose and exposure levels.

Over the coming weeks, we will update our dosing model and request a Type A meeting with the FDA. The Type A meeting is a meeting that occurs typically within 30 days to discuss the development program to proceed to a path for approval. At this meeting, we intend to share the results of our modeling as well as our new dosing regimen and propose the immediate resubmission of our NDA. If the FDA agrees with our proposal, then we plan on resubmitting the NDA before the end of the year. The review cycle for a resubmission of this kind is typically 6 months. However, given the narrowness of the resubmission, we will request a shorter review cycle, as is our right. This decision will be completely at the discretion of the FDA.

In summary, while we did receive a CRL from the FDA for our Libervant application, today is an important step forward for Aquestive and the patients who will benefit from having access to Libervant. The FDA's comments are limited to one study. The comments on the study are limited to 2 weight groups. We can use our modeling to update the dosing regimen for these 2 weight groups, and we believe that this solution presents a promising path forward to approval. And we're hopeful the FDA will agree in the soon-to-be-scheduled Type A meeting.

This concludes my prepared remarks, and I'll now open the line for questions.

Questions and Answers

OPERATOR: (Operator Instructions) Your first question comes from the line of Randall Stanicky from RBC.

KEITH J. KENDALL: Randall, are you there?

DANIEL JAMES BUSBY, ASSISTANT VP, RBC CAPITAL MARKETS, RESEARCH DIVISION: Yes. Sorry, this is Dan Busby on for Randall. So first question, I know that you've talked about the linear relationship in weight-based dosing before. So just to be clear, do you intend to change the way you model that relationship itself? And would that have an impact on any of the other 8 studies?

DANIEL BARBER, SENIOR VP & COO, AQUESTIVE THERAPEUTICS, INC.: Thanks, Dan. This is Dan Barber. Good to hear your voice. So from a -- if you think about the modeling we use, the linearity is driven by all of those 8 studies. So it's actually the other way around. The studies created the linearity, which is what we can use to adjust our dosing regimen. So to make it a practical example, in one of our weight groups, we are using 12.5 milligrams against the Diastat level of 15 milligrams. We will up our 12.5 milligrams to 15 milligrams, and we will then put that in the model to recast what those dosing regimen at that level would produce. So the robustness of the model we have is actually what will benefit us now, rather than it being something that goes backwards and creates a problem for us in our past studies.

DANIEL JAMES BUSBY: Okay. Got it. That's helpful. And then I mean, if it sounds -- if FDA's concerns could be addressed with what sounds like a fairly straightforward adjustment, does it surprise you that FDA didn't simply ask for that information during the review, even if it meant potentially extending the PDUFA date by a few months?

KEITH J. KENDALL: The -- as I said, we've been working with the FDA intensively for the last couple of weeks. The question came up very late, and we addressed it with them. We've actually had 2 meetings with them in the last 2.5 weeks to talk through it. And I just don't think based on when the question came up and the work that had to be done with the model that there was time left.

DANIEL JAMES BUSBY: Got it. Understood. Just one more question for me. It sounds like your base case assumption is a 6-month review. But can you talk about the factors that FDA might consider when deciding whether to grant a 2-month versus 6-month review?

DANIEL BARBER: Well, as you, I'm sure, know, a 6-month review -- a 2-month review is usually for minor adjustments, right? If you had an excipient that you were switching out the vendor, that would be a 2-month review. When you get into clinical changes, that is typically the 6-month review cycle. What we will argue in this case, though, is because we are using modeling and we are submitting no new clinical data, and our modeling changes and our dosing regimen are isolated to 2 weight groups, that the review cycle can be supported in a faster time. But as Keith said, that is completely at the discretion of the FDA.

OPERATOR: And your next question comes from the line of Jason Butler from JMP Securities.

JASON NICHOLAS BUTLER, MD, DIRECTOR OF HEALTHCARE RESEARCH & EQUITY RESEARCH ANALYST, JMP SECURITIES LLC, RESEARCH DIVISION: I just wanted to clarify. Did you, in the discussions with FDA over the last couple of weeks, propose the modeling solution? And did they give you any feedback into that potential route to a solution?

DANIEL BARBER: Jason, nice to hear for your voice. This is Dan. Yes, we did talk to the FDA about modeling as a solution. We found their comments to be helpful. The FDA, of course, would never say on any program for any reason it absolutes. But we do -- from our discussions, we do feel it's an appropriate and reasonable path forward that we'll have a very robust and positive conversation with the FDA.

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

JASON NICHOLAS BUTLER: Okay. And then I guess I'm looking at Slide 4 here, where you're showing the PK levels. And it looks like your PK profile is more consistent across the different weight groups versus Diastat, which has a higher Cmax in lighter patients, the lower Cmax in heavier patients. Do you get -- have you had feedback from FDA that acknowledges that the PK profile may be more predictive and the product appears more consistent across a range of weight groups?

DANIEL BARBER: Yes. And thank you, Jason, that's a very good observation. We have -- the FDA has acknowledged to us that at the study level, in particular, we have results that are within comparability and that our variability is better when compared to Diastat. You're absolutely also right that when you look at the weight bins, across those weight bins on Slide 4, you can see the tightness of our error bars and the tightness of our range when compared to Diastat, where at the low level, patients are getting a very high level, an unnecessarily high level, in some cases. And at the high weight group, they're getting a very low level and a level that perhaps is problematic for them.

So one of the things we did struggle with the FDA is what level exactly are they looking for across all weight groups. And that's why on this slide, we included the overall Diastat Cmax level of 211. We do think that when we update our dosing regimen, we will be well within the range the FDA is looking for. And one helpful way we have approached that in understanding that is there is public information out there on other programs. Obviously, we can't compare ourselves to other programs such as diazepam nasal spray. There's a product called VALTOCO. But we have noted that in their public information, their patient data has a Cmax level in patients with epilepsy of 145 nanograms per milliliter. So for us, we get a lot of confidence when we see the VALTOCO level at 145, the Diastat level at 211, and we know we're already at the 211 and when we put our new dosing regimen, and we'll be well above that. So I know that was long-winded, Jason. But hopefully, that helped with your question.

JASON NICHOLAS BUTLER: That's really helpful, Dan. And then just one more question, Keith, and I get that you're going to have a limited amount you can say here. But can you just comment as to in terms of the KYNMOBI, the apomorphine royalty monetization, whether anything has changed in your plans or your broad time lines in securing that transaction?

KEITH J. KENDALL: Jason, you know how much I hate disappointing all of you. We're not going to make any comments about that. We'll provide an update on that in our earnings call in November.

OPERATOR: (Operator Instructions) Our next question comes from the line of Liana Moussatos from Wedbush.

SHVETA VILAS DIGHE, ASSOCIATE, WEDBUSH SECURITIES INC., RESEARCH DIVISION: This is Shveta for Liana. Keith, can you remind us of the different weight groups in the Libervant study? And then on the call, you mentioned 4 of the 5 patients were in the same group. Can you talk about which group they belong to?

KEITH J. KENDALL: Sure. I'll let Dan walk you through that.

DANIEL BARBER: Shveta, I think where Jason had pointed to Slide 4 in the documents we sent around, that's a good slide to get an understanding of what was in the study. And if you look at that slide, there are yellow and blue bars. The yellow bars are Diastat. The blue bars are Libervant, and they're divided into 4 buckets. And those 4 buckets represent the 4 weight groups that were in this study, so if you see 51 to 62 and then on up all the way to 80 kilos and higher. So inside of those 4 weight groups, you also have the N at the top of the chart here so you can see the degree of subjects we had in each of the weight groups.

SHVETA VILAS DIGHE: And then the 4 of the 5 patients, are they on the higher weight group?

KEITH J. KENDALL: The 2 weight groups that the FDA has issue with are the 51 to 62 kilo, and you can see that our Cmax is lower in that group compared to Diastat, and the 76 to 87 kilo group, where you can see that relationship as well. The 4 -- 4 of the 5 subjects are in those 2 buckets.

SHVETA VILAS DIGHE: Got it. Okay. And can you talk about like the protocol deviations in blood draw? And then what aspects of the study gives you confidence that you can adequately address the concerns without any additional studies?

DANIEL BARBER: Yes. That -- the protocol deviations were for blood draws that were well out 3 days and out in terms of time points. And there was a very limited number of blood draws. We -- while it was noted in the CRL, we don't anticipate that being a major issue.

SHVETA VILAS DIGHE: Okay. And do you now anticipate the orphan decision to happen after potential approval in first half of '21 for Libervant?

DANIEL BARBER: Well, all exclusivity matters for any drug only happen after the approvability package comes from SEDAR, the review division. So exclusivity of any sort would wait until that time period. So we would anticipate when our next PDUFA date comes around, that's when the FDA would review the exclusivity provisions.

SHVETA VILAS DIGHE: Got it. Okay. And then my last question is about the Type A meeting. When would you provide us with minutes or updates on discussions on the Type A meeting?

KEITH J. KENDALL: Once we have the meeting and we know the path forward, it would be our intent to update everybody on what happens next.

OPERATOR: And your next question comes from the line of Ram Selvaraju from H.C. Wainwright.

RAGHURAM SELVARAJU, MD OF EQUITY RESEARCH & SENIOR HEALTHCARE ANALYST, H.C. WAINWRIGHT & CO, LLC, RESEARCH DIVISION: So just to clarify, the FDA has not provided any commentary on the orphan drug status or the approvability of the NDA as it pertains specifically to the orphan drug status held by VALTOCO. Is that correct?

KEITH J. KENDALL: The FDA provided no commentary whatsoever on the orphan drug issue. That's correct.

RAGHURAM SELVARAJU: And then secondly, can you comment on what the implications are for commercial planning as that pertains to Libervant, also the potential delays in the approval to potentially end of the first half of 2021? Does that potentially impact any of the initiatives that you had originally planned to institute in order to prepare the market for the introduction of Libervant? Or will all of that pretty much stay on track since you already have an existing sales force in the field, and there wasn't any significant additional sales and marketing infrastructure that you were envisaging putting in place?

KEITH J. KENDALL: Sure. Other than -- there'll be certain actions that we'll push out like building out the Libervant portion of the sales force. Obviously, there's no point in doing that today. But the rest of the activities to continue to support SYMPAZAN as the precursor footprint or prepare the market with literature and other types of things in support of a Libervant launch will continue on. Nothing has changed about our confidence in the strength and value in this market for epilepsy patients.

RAGHURAM SELVARAJU: And then with respect to the Type A meeting, it is your view, just to confirm, that once that Type A meeting has been held, you'll have definitive clarity on what the requirements are. And the FDA will make it very clear at that juncture that no additional clinical studies are needed, right?

DANIEL BARBER: Ram, this is Dan. I wish there was an FDA meeting that was that clear. I think you know how that meeting will go. We will put our position forward. We will get comments from the FDA. Typically, the comments from the FDA are very helpful in understanding the position that the FDA views your packaging, and we will resubmit from there. We do not anticipate any need for additional clinical studies, and we are confident that the population PK modeling approach will help with the deficiencies the FDA has outlined.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.

KEITH J. KENDALL: Operator, are there any more questions?

OPERATOR: And as there are no further questions at this time, I will now turn it back to Mr. Keith Kendall for closing remarks.

KEITH J. KENDALL: Well, again, thank you, everyone, for taking the time to adjust your schedules on a Friday night before you start your weekend. We appreciate you doing that and your flexibility. And as this continues to unfold, we will keep everyone up-to-date on what's going on with this program. Again, thank you, and have a good night.

OPERATOR: And this concludes today's conference call. Thank you for participating. You may now disconnect.

[Thomson Financial reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON FINANCIAL OR THE APPLICABLE COMPANY OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.]

[Copyright: Content copyright 2020 Thomson Financial. ALL RIGHTS RESERVED. Electronic format, layout and metadata, copyright 2020 ASC LLC (www.ascllc.net) ALL RIGHTS RESERVED. No license is granted to the user of this material other than for research. User may not reproduce or redistribute the material except for user's personal or internal use and, in such case, only one copy may be printed, nor shall user use any material for commercial purposes or in any fashion that may infringe upon Thomson Financial's or ASC's copyright or other proprietary rights or interests in the material; provided, however, that members of the news media may redistribute limited portions (less than 250 words) of this material without a specific license from Thomson Financial and ASC so long as they provide conspicuous attribution to Thomson Financial and ASC as the originators and copyright holders of such material. This is not a legal transcript for purposes of litigation.]

**---- Index References ----**

Company: AQUESTIVE THERAPEUTICS INC; H C Wainwright; ICR LLC; RBC CAPITAL MARKETS; REFINITIV US LLC; WEDBUSH SECURITIES INC

News Subject: (Business Management (1BU42); Corporate Events (1CR05); Earnings Calls (1EA37); Health & Family (1HE30); Meeting Announcements (1ME17))

Aquestive Therapeutics Inc Conference Call - Final

Industry: (Drug Approval Process (1DR91); Drug Discovery & Development Process (1DR41); Drugs (1DR89); Experimental Drugs (1EX42); Pharmaceuticals (1PH33); Pharmaceuticals & Biotechnology (1PH13); Pharmaceuticals Research & Development (1PH57); Press Releases (1PR19))

Language: EN

Other Indexing: (ASC LLC; JMP SECURITIES LLC) (Vilas; DANIEL JAMES BUSBY; RAGHURAM SELVARAJU; Raghuram Selvaraju; KEITH J.; Randall Stanicky; Stephanie Carrington; DANIEL JAMES; Dan Busby; KEITH J. KENDALL; Keith J. Kendall; Kendall Randall; J. KENDALL; Keith Kendall; Daniel Barber Jason; John Maxwell; John T. Maxwell; Daniel Barber Shveta; Ken; Dan Barber; Daniel Barber; JASON NICHOLAS BUTLER; Nicholas J. Butler; Keith J. Kendall Jason; Daniel Barber Ram; DANIEL BARBER; Daniel Barber; Liana Moussatos)

Word Count: 3678

**End of Document** © 2021 Thomson Reuters. No claim to original U.S. Government Works.

